U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 SEP -8 AM 9: 10

CLERK

DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

GIZMOCUP L.L.C., D/B/A NORTHEAST PHARMA,
        Plaintiff,
vs.

MEDLINE INDUSTRIES INC.,
        Defendant.

Case No.: 2:21-cv-213

## PLAINTIFF'S COMPLAINT FOR DAMAGES

NOW COMES Plaintiff, Gizmocup LLC D/B/A Northeast Pharma (hereafter "Northeast Pharma") and brings forth its cause of action against Medline Industries Inc. ("Medline"), and complains as follows:

### PARTIES

1. Gizmocup LLC, D/B/A Northeast Pharma, is a Vermont based company specializing in the sale and distribution of consumer goods, through its storefront on the Amazon.com marketplace as a third-party seller. Northeast Pharma owns and operates an Amazon storefront under the seller name "Atlantic Pharma Co".

2. Medline Industries Inc. (hereafter as Medline) is an Illinois based healthcare business that manufacturers and distributes medical supplies under several brand names including the "Medline" brand.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Northeast Pharma's claims raised herein pursuant to 28 U.S.C. § 1332(a)(1) because the citizenship of the parties is diverse and the amount in controversy is in excess of $75,000.00.

4. The alleged acts of tortious interference and libel per se are directly related to the products shipped by Medline from Medline's warehouses throughout the United States to Northeast Pharma in Vermont.

## RELEVANT FACTS

5. Northeast Pharma is, at all relevant times, a third-party seller on Amazon. Amazon defines a third-party seller as independent sellers who offer a variety of new, used, and refurbished items.[1] As a third-party seller, Northeast Pharma was, and is, a downstream purchaser that customarily listed and sold goods bearing the trademarks and other intellectual properties of manufacturers and other holders of intellectual property rights. Such sales are absolutely lawful under the "First Sale" and "Fair Use" doctrines. Moreover, such activities are expressly permitted by Amazon, so long as the goods sold and delivered are authentic and the intellectual properties are not misused. *See* Exhibit A - Amazon's Intellectual Property Policy For Sellers.

6. Northeast Pharma and Amazon are parties to Amazon's Business Solutions Agreement, binding both parties to the terms thereof and policies adopted thereunder. *See* Exhibit B - Amazon Services Business Solutions Agreement.

7. From April 2020 through February 2021, Northeast Pharma bought over 10,000 Medline branded perineal bottles from an authorized reseller of Medline products - Health Products For You ("HPFY"). *See* Exhibit C - Purchase invoices for Medline Perineal bottles.

8. HPFY is an online retailer that owns and operates the website

---

[1] See description from Amazon website at:
https://www.amazon.com/gp/help/customer/display.html?nodeId=GEF528GN65XSJ7V8.

https://www.healthproductsforyou.com. HPFY promotes itself as an "Authorized Medline Retailer" on its website. Based on this fact, Northeast Pharma intentionally selected HPFY as a vendor to purchase Medline products so as to avoid any possibility of purchasing inauthentic or counterfeit products. *See* Exhibit D - HPFY Authorized Retailer Badge.

9. HPFY is located at 14 Fairfield Dr, Brookfield, CT. HPFY does not maintain any physical inventory of Medline perineal bottles. Instead, HPFY "drop shipped" Northeast Pharma's orders for the Medline perineal bottles from Medline's warehouses throughout the United States to Northeast Pharma directly in Vermont. The perineal bottles were sold by Medline and HPFY in bulk quantities of 50 bottles within each case pack. *See* Exhibit D - HPFY webpage for sale of Medline perineal bottles.

10. Northeast Pharma directly placed orders for Medline perineal bottles from HPFY, specifically through account representative Andy Mercier, over the phone and by submitting purchase orders via email. Medline fulfilled these orders, on three separate occasions, by shipping the products from its Medline warehouses directly to Northeast Pharma in South Burlington, VT. *See* Exhibit E - Medline Bill of Landings, *also see* Exhibit F - Photo of Medline shipping pallet.

11. At no point in any of the transactions did either HPFY or Medline ever directly inform or notify Northeast Pharma of any restrictions regarding the resale of Medline products or that the Medline perineal bottles purchased may be counterfeit.

12. Beginning in December 2020, Northeast Pharma began listing the Medline perineal bottles for sale in a 3-pack quantity. *See* Exhibit G - Amazon.com listing for "3 pack" of Medline brand perineal bottles dated July 7, 2021. It is a customary practice on Amazon.com that

authentic products are bundled for sale as bulk or multi-pack items. Amazon provides specific guidance and instructions concerning permissible practices regarding bulk or multi-pack listings. *See* Exhibit H - Amazon Product Bundling Policy.

13. Northeast Pharma believed it was purchasing authentic Medline perineal bottles from Medline, via its authorized retailer HPFY, in bulk. In turn, Northeast Pharma then assembled those perineal bottles in 3-pack quantity packages, which consisted of three individual Medline brand perineal bottles that remained in their original labeling and condition as received directly from Medline. Northeast Pharma then affixed a required unique sticker, assigned by Amazon.com only to Northeast Pharma for this specific product offering, to the product for identification and tracking purposes. Amazon.com requires this type of labeling for the vast majority of health and personal care products for product safety compliance issues.

14. Accordingly, it is important to understand that Northeast Pharma is not "rebranding" any Medline product or attempting to sell a counterfeit Medline product. Northeast Pharma merely purchased Medline perineal bottles in bulk supply directly from the manufacturer and then resold the perineal bottles in a smaller quantity in its Amazon store. This is a routine and customary practice performed by third party sellers, as well as Amazon itself, on the Amazon marketplace.

15. On February 23, 2021, Northeast Pharma received an Amazon generated email stating that Amazon received a report that Northeast Pharma's Amazon storefront, Atlantic Pharma Co, was selling counterfeit items in violation of Medline's trademark and, as a result, Northeast Pharma's offer was removed from the listing on Amazon.com. *See* Exhibit I -

Amazon emailed dated 02/23/2021 regarding Medline counterfeit claim.

16. The Amazon email identified the "rights owner's contact details" as Michael Murphy and amazon@medline.com. *Id.* It also identified Medline as the entity that owned the trademark and was the entity responsible for filing the report of counterfeit activity. *Id.* The email specifically identified the Medline perineal three pack listing as the basis for the counterfeit claim. *Id.*

17. Amazon has formal, mandatory procedures to remove a seller's offer based upon authenticity complaints from an alleged owner of intellectual property. The procedure and required attestations are published at https://www.amazon.com/gp/help/reports/infringement. *See* Exhibit J - Amazon Infringement Reporting website. Despite very specific instructions regarding appropriate use of the Infringement Report website, Medline executed the foregoing procedure, not only once, but twice, with falsity, malice, and with actual knowledge that the products being offered by Northeast Pharma were authentic and not counterfeit.

18. The Amazon counterfeit notice provided two options to appeal the counterfeit claim. The first option was to provide Amazon directly with any of the following documentation: "An invoice, letter of authorization, or a licensing agreement from the manufacturer or rights owner demonstrating that your products are lawful." *Id.*

19. The second option was to contact the right's owner that filed the report with Amazon and ask them to submit a retraction. Amazon would only accept retractions submitted from the right's owner directly. Michael Murphy was listed as the contact person with an email address of amazon@medline.com. *Id.*

20. Northeast Pharma immediately pursued both options in an effort to resolve the issue.

21. On February 25, 2021, Mr. James Becker, Director of Business Development for Northeast Pharma, sent an email directly to the contact person on the Amazon generated email, Michael Murphy (an attorney at K&L Gates), stating that Northeast Pharma was willing to provide them with invoices and the names of the account representatives at HPFY that originally sold the products. *See* Exhibit K - Emails from Northeast Pharma to Michael Murphy. Despite the transparency and willingness to discuss the matter, Mr. Becker's email never received a response. A follow-up email requesting a response was also sent on March 3, 2021, but again there was no response. *Id.*

22. Northeast Pharma also sought recourse directly through Amazon's appeal process on the basis that the products they offered were authentic and not counterfeit. On March 4, 2021, Northeast Pharma provided Amazon with invoices demonstrating that the products were originally purchased from an authorized Medline reseller, specifically HPFY. Northeast Pharma also provided the Bill of Lading for each shipment directly from Medline to Northeast Pharma in South Burlington, VT. *See* Exhibit E -- Bill of Ladings.

23. In just two days, on March 6, 2021, Amazon was able to verify that the products were indeed authentic Medline products and granted Northeast Pharma's appeal and sent an email notifying Northeast Pharma that it was permitted to relist and continue to offer these specific Medline perineal bottles products for sale on its storefront in a 3-pack quantity. *See* Exhibit L - Amazon approval email.

24. On March 8, 2021, Mr. Becker received a rather confusing claim letter sent via first class mail from Mr. Murphy that was dated March 1, 2021. *See* Exhibit M - Medline's Cease

6

and Desist Letter. This letter claimed that Northeast Pharma's Amazon storefront ("Atlantic Pharma Co") was tortiously interfering with a purported "Authorized Distributor Agreement", although such agreement or proof of its existence was never provided. As no such "authorize distributor agreements" were ever disclosed, Northeast Pharma had no knowledge that one even existed, let alone of any restrictions it may contain. Importantly, nowhere in this claim letter is there a single allegation that Northeast Pharma was selling counterfeit product. In fact, the word "counterfeit" does not appear anywhere in the claim letter.

25. Mr. Becker, again, immediately attempted to contact Mr. Murphy regarding this claim letter. As documented by Mr. Becker's March 8, 2021 email, upon receipt of the claim letter: 1) Northeast Pharma called Mr. Murphy but was only able to speak with his paralegal, 2) Mr. Becker explained the legitimate sourcing of the Medline perineal bottles, 3) Northeast Pharma confirmed that it would unilaterally remove and disable all offers for Medline perineal listings sold on its Amazon storefront, and 4) all such listings would remain suspended until resolution on the issue. *See* Exhibit N - March 8, 2021 email. All these actions were precautionary and in the spirit of cooperation as Northeast Pharma knew that it was not selling any counterfeit items and did not want any further accusations of such. *See* Exhibit O - Northeast Pharma unanswered emails to N. Cowan dated.

26. Mr. Murphy's lone response to Mr. Becker's good faith attempt to resolve any perceived concerns was his March 8, 2021 email that simply stated: "Thanks- we will pass your info along." *See* Exhibit P, email from M. Murphy. Afterwards, it was once again radio silence for weeks from Mr. Murphy regarding either his March 2021 cease and desist letter or the

initial counterfeit claim that he submitted to Amazon.

27. As of the time of Mr. Murphy's email, it is clear that Medline was aware of the following: (1) Medline itself had directly shipped the products to Northeast Pharma, (2) Medline claimed those same products were counterfeit to Amazon, (3) Northeast Pharma successfully demonstrated to Amazon that the product was not counterfeit, (4) Northeast Pharma would remove its offers for any Medline brand products on its Amazon storefront, and (5) Northeast Pharma demonstrated a willingness to talk in good faith and to cooperate with any remaining concerns.

28. On April 1, 2021, rather than take any steps to directly resolve any issue with Northeast Pharma, Medline filed another false counterfeit report with Amazon. Because this was a second allegation, it created a heightened level of scrutiny and Amazon completely shut down Northeast Pharma's seller storefront on Amazon.com. This complete shutdown meant that Northeast Pharma was unable to operate in any capacity and that all listings, even for non-Medline products, were suspended. It also meant that all Amazon seller account funds (proceeds from sales generated during a given timeframe) were frozen and that Northeast Pharma could not access those funds for the purposes of paying vendors, other business obligations and payroll.

29. Northeast Pharma routinely operates with over 500 product offerings or listings per day and averages between 1500 and 2000 orders per day. In order to operate, it generally employs around 20-30 employees at a given time. The suspension of its Amazon storefront brought operations to a halt and staff hours were limited as a result.

30. Despite Northeast Pharma's repeated requests to Medline to amicably resolve the situation

immediately, such as submitting a retraction notice to Amazon, Medline was content to sit on their hands and do nothing. Medline's second repeated counterfeit claim to Amazon is identical to its initial claim that was quickly disproven as Northeast Pharma was not selling counterfeit items.

31. Northeast Pharma had to go through a labor-intensive process with Amazon as part of the second review process. After six weeks of investigation, Northeast Pharma was again successful in proving that it was not selling counterfeit items and violated none of Amazon policy restrictions. However, from April 23, 2021 until May 5, 2021, Northeast Pharma's Amazon storefront was unjustly suspended due to the second counterfeit complaint filed by Medline. As a result, Northeast Pharma suffered damages, including but not limited to, lost profit, lost subscribers and customer goodwill, inability to sell lawful products, and damage to reputation.

32. On May 5, 2021, Amazon approved Northeast Pharma's appeal and reinstated its seller account. *See* Exhibit P - Amazon appeal granted. On June 1, 2021, Amazon conducted additional investigation of the authenticity of Northeast Pharma's inventory at Amazon of the Medline perineal bottles. *See* Exhibit Q - Amazon investigation email dated 06/01/21. Based upon Northeast Pharma's submission of invoices from HPFY, several Bill of Ladings directly from Medline to Northeast Pharma and on the presentation of HPFY as an authorized reseller of Medline products, Amazon found that the Medline perineal bottles were authentic and again authorized Northeast Pharma to offer the products on its Amazon storefront. *See* Exhibit R - Amazon authenticity approval of Medline products.

## COUNT I –FALSE INFRINGEMENT CLAIMS AT AMAZON

33. Northeast Pharma incorporates the allegations above as though the same were re-written at length.

34. Plaintiff, Northeast Pharma, was, at all relevant times, a third-party seller on Amazon, which means that it was a downstream purchaser that often listed and sold goods bearing the trademarks and other intellectual properties of manufacturers and other holders of intellectual property rights. Such sales were absolutely lawful under the "First Sale" and "Fair Use" doctrines and expressly permitted by Amazon, so long as the goods sold and delivered are authentic and the intellectual properties are not misused.

35. The tort of interference with contractual relations, as set forth in Restatement (Second) of Torts § 766, has long been adopted under Vermont law. *Mitchell v. Aldrich*, 122 Vt. 19, 22, 163 A.2d 833, 835-36 (1960) ("Except for special justification, the law has long recognized liability against one who intentionally intrudes to disrupt an existing contract relation.") The elements of the tort, as set forth by Restatement (Second) of Torts § 766, are as follows: One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. *See supra* at § 766.

36. At the time of Northeast Pharma's suspension from Amazon, it had a thriving storefront.

37. Medline knowingly and falsely executed and submitted a counterfeit complaint on Amazon against Northeast Pharma. Assuming arguendo that Medline made an honest mistake when

it had issued the first counterfeit complaint on Amazon on or about February 23, 2021, Medline had absolute proof of its error and had open lines of communication by February 25, 2021, when Northeast Pharma contacted them directly in response to the first Amazon counterfeit complaint which Amazon deemed authentic and genuine. Yet rather than retracting its initial report, Medline pursued further retaliatory false claims; to wit, it issued another false counterfeit claim with Amazon on April 1, 2021 to further harm Northeast Pharma.

38. Lost sales during the timeframe when Northeast Pharma's Amazon account was suspended is, based on year over year analysis of the same timeframe but during FY2020, in excess of $230,000.00 USD.

39. Medline acted maliciously and intentionally in submitting a counterfeit report to Amazon after Medline indisputably knew that Northeast Pharma was not selling Medline counterfeit products.

40. Medline's knowingly false accusations of counterfeiting, made directly to Amazon, were for the improper purpose of causing the suspension of Northeast Pharma's Amazon storefront; and those actions interfered with Northeast Pharma's business relationship with Amazon and proximately caused Northeast Pharma's temporary suspension.

## COUNT II - LIBEL AS A MATTER OF LAW

41. Northeast Pharma incorporates the allegations above as though the same were re-written at length.

42. Medline published written complaints to Amazon alleging that Northeast Pharma was a counterfeiter which is libelous per se.

43. The general elements of a private action for defamation (libel and/or slander) are: (1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages. *Lent v. Huntoon,* 143 Vt. 539, 546-47, 470 A.2d 1162, 1167 (1983).

44. Spoken defamation involving (1) imputation of a crime, (2) statements injurious to one's trade, business or occupation, or (3) charges of having a loathsome disease were deemed slander per se and were actionable without proof of special damages. *Id.* Thus "actionable per se" simply means special damages need not be proved in libel actions or in those slander actions which fall into one of the exceptions categorized as slander per se.

45. Medline's accusations falsely charged Northeast Pharma with a serious crime or crimes, to wit: counterfeiting, a form of fraud, undertaken by means of interstate wire services, itself a federal felony. *See* 18 U.S.C. §1343.

46. Medline's accusations against Northeast Pharma caused Northeast Pharma reputational injury, e.g. absence of website offerings, reportable history to prospective vendors and investors, and too many ramifications to detail.

47. Although injury may be presumed due to libel as a matter of law, Northeast Pharma suffered above and beyond presumed damages, e.g. loss of enterprise value and income. In particular, Northeast Pharma lost goodwill specific to the Northeast Pharma-Amazon relationship that cannot be recovered, including Northeast Pharma's temporary right to sell a broad range of products on Amazon.com, over 99% of which is completely unrelated to

Medline or its products.

WHEREFORE, Plaintiff, Northeast Pharma, prays for relief as follows:

    A. Compensatory damages of at least $75,000.00;

    B. Punitive damages of not less than $150,000.00;

    C. Attorney fees and costs; and

    D. Such other and further relief as the Court may order.

## JURY DEMAND

Plaintiff demands a trial by jury as to all triable issues.

DATED this 8th day of September, 2021.

                            GIZMOCUP LLC
                            D/B/A NORTHEAST PHARMA

BY:   PAUL FRANK + COLLINS P.C.

BY:   _____
        David M. Pocius, Esq.
        PO Box 1307
        Burlington, VT 05402-1307
        802-658-2311
        dpocius@pfclaw.com

                                              &

Dustin A. Lane, Esq.
Slattery Petersen PLLC
2915 Biscayne Blvd. Ste 300-15
Miami, FL 33137
786-220-6647
dlane@slatterypeterson.com
(*pro hac vice motion forthcoming*)

                                         &

James J. Becker, Esq.
3060 Williston Rd., Ste. 3
South Burlington, VT 05403
802-800-1791
james.becker@northeastpharma.com
(*pro hac vice motion forthcoming*)

8330513_2:14547-00001