U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2023 MAY 26  AM II: 54

CLERK

BY_____HW_____
DEPUTY CLERK

GIZMOCUP L.L.C., doing                    )
business as Northeast Pharma and          )
Atlantic Pharma Co, LLC,                  )
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )    Case No. 2:21-cv-00213
                                          )
MEDLINE INDUSTRIES INC.,                  )
                                          )
            Defendant.                    )

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**
(Doc. 40)

Plaintiffs Gizmocup L.L.C. d/b/a Northeast Pharma ("Northeast Pharma") and

Atlantic Pharma Co LLC ("Atlantic Pharma") (collectively, "Plaintiffs") bring this action

against Defendant Medline Industries Inc. ("Medline"), alleging tortious interference

with contractual relations and libel. Plaintiffs' claims stem from complaints that Medline

filed with Amazon.com ("Amazon") regarding Plaintiffs' sale of Medline's products on

Amazon's website.

Pending before the court is Medline's motion to dismiss Plaintiffs' Amended

Complaint (the "AC") pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6). (Doc. 40.)

Medline argues that this court lacks personal jurisdiction over it and seeks dismissal on

that basis. In the alternative, it argues that Plaintiffs fail to state a claim upon which relief

can be granted. Plaintiffs opposed the motion on July 15, 2022. On July 26, 2022,

Medline replied. The court heard oral arguments on the motion to dismiss on October 20,

2022, at which point the court took the pending motion under advisement.

Plaintiffs are represented by David M. Pocius, Esq., Dustin A. Lane, Esq., and

James J. Becker, Esq. Medline is represented by Matthew B. Byrne, Esq., and Zachary

M. Dayno, Esq.

## I.      Procedural Background.

Northeast Pharma filed its original Complaint on September 8, 2021. (Doc. 1.)
Medline filed a motion to dismiss the original Complaint pursuant to Fed. R. Civ. P.
12(b)(2) and 12(b)(6) on October 29, 2021. (Doc. 13.) The motion was opposed on
December 10, 2021 (Doc. 17), and Medline replied on January 5, 2022. (Doc. 23.) The
court held a hearing on April 26, 2022, at which time it granted the motion to dismiss for
lack of personal jurisdiction and granted Northeast Pharma leave to file the AC. On May
27, 2022, Plaintiffs filed the AC, which, among other things, added Atlantic Pharma as a
co-Plaintiff.

## II.     Allegations in the AC.

Northeast Pharma is headquartered and incorporated in Vermont and specializes in
the sale and distribution of consumer goods as a third-party seller on Amazon's website.
In this capacity, Northeast Pharma is "a downstream purchaser that customarily listed and
sold goods bearing the trademarks and other intellectual properties of manufacturers and
other holders of intellectual property rights." (Doc. 34 at 2-3, ¶ 7.) Plaintiffs contend that
such sales are permitted by Amazon, provided the goods sold and delivered are authentic
and intellectual property rights are not misused.

"Northeast Pharma routinely maintains over 500 product offerings or listings per
day and averages between 1500 and 2000 orders per day" through the Atlantic Pharma
storefront. *Id.* at 11, ¶ 38. To meet this demand, "it generally employs around [ten to
fifteen] Vermont residents at a given time." *Id.*

Atlantic Pharma, incorporated in Delaware, is a wholly-owned subsidiary of
Northeast Pharma and "a flowthrough (pass-through) business entity that passes all its
income, rights, assignments, and liabilities . . . to Northeast Pharma." *Id.* at 1, ¶ 2.
Atlantic Pharma was "created by Northeast Pharma . . . for storefront presentational
purposes" on Amazon. *Id.* at 2, ¶ 3. Atlantic Pharma does not have employees, a bank
account, or business operations, and is a "mere alter ego" of Northeast Pharma. (Doc. 34
at 2, ¶ 3.) Although Atlantic Pharma is "utilized" as the "namesake" for its sales on
Plaintiffs' Amazon website, Plaintiffs assert that "all the contractual obligations and

2

liabilities . . . are assigned and assumed by Northeast Pharma[,]" rendering Northeast Pharma the "true party in interest to Amazon's Business Solutions Agreement[.]" *Id.* at 3, ¶ 8. Northeast Pharma is "the primary account manager for . . . Atlantic Pharma's storefront." *Id.* at ¶ 9.

Medline is "a healthcare business that manufacturers and distributes medical supplies under several brand names including the 'Medline' brand" which is headquartered in Illinois and "purportedly incorporated in Delaware." *Id.* at 2, ¶ 4.

Plaintiffs allege that from April 2020 through February 2021, Northeast Pharma purchased over 10,000 Medline branded perineal bottles from non-party Health Products for You ("HPFY"), which is located in Fairfield, Connecticut. HPFY advertised itself as "an Authorized Medline Retailer[,]"and Plaintiffs relied on this representation to "avoid any possibility of purchasing inauthentic or counterfeit products." *Id.* at 3-4, ¶¶ 10-11 (citation omitted).

Northeast Pharma ordered Medline perineal bottles through HPFY account representative Andy Mercier. Its initial purchase on April 9, 2020 was for 6,000 "Medline Perineal Cleansing Bottle With Screw Top." *Id.* at 5, ¶ 15. "All 120 cases[,]" each case holding fifty bottles, were shipped to "Vermont, freight prepaid, directly from Medline to Northeast Pharma in Vermont." *Id.* Due to the quantity of bottles ordered, Plaintiffs assert "it was evident that Northeast Pharma was purchasing" Medline products for resale. *Id.* at 4, ¶ 13. In fact, "Northeast Pharma specifically disclosed to Mr. Mercier that the products would be resold" and no HPFY representative "object[ed to] or warn[ed] against this practice." *Id.*

Because HPFY does not maintain an inventory of Medline perineal bottles, each of Plaintiffs' orders were directly shipped from Medline's warehouses to Northeast Pharma in Vermont. *Id.* at ¶ 12.[1] Plaintiffs allege that Medline filled Plaintiffs' orders of

---

[1] Although Medline appears to contest this allegation, the court does not resolve questions of fact at the motion to dismiss phase. *See Brady v. Anker Innovations Ltd.*, 2020 WL 158760, at *9 n.9 (S.D.N.Y. Jan. 13, 2020). Plaintiffs have attached shipping documents to their AC that designate Medline as the "shipper" and Gizmocup as the "consignee." *See* Doc. 34-10 at 2-3. They have

perineal bottles on four occasions. "At no point . . . did either HPFY or Medline ever directly inform or notify Northeast Pharma that the Medline perineal bottles purchased may be counterfeit." *Id.* at 5, ¶ 18.[2]

In December 2020, Northeast Pharma began to offer Medline perineal bottles for resale in packs of three on Amazon's website. Plaintiffs allege that:

> Northeast Pharma believed it was purchasing authentic Medline perineal bottles from Medline, via its authorized retailer HPFY, in bulk. In turn, Northeast Pharma then assembled those perineal bottles in 3-pack quantity packages, which consisted of three individual Medline brand perineal bottles that remained in their original labeling and condition as received directly from Medline. Northeast Pharma then affixed a required unique sticker, assigned by Amazon.com only to Northeast Pharma for this specific product offering, to the product for identification and tracking purposes. Amazon.com requires this type of labeling for the vast majority of health and personal care products for safety compliance issues.

*Id.* at 6, ¶ 20.

Northeast Pharma allegedly did not "'rebrand[]' any Medline product or attempt[] to sell a counterfeit Medline product." *Id.* at ¶ 21. Rather, Plaintiffs assert that their re-sale practice "is a routine and customary practice performed by third party sellers, as well as Amazon itself, on the Amazon marketplace." *Id.*

---

also attached a photograph depicting Medline labeling on a shipment they received. *See* Doc. 34-11 at 2.

[2] Medline states that HPFY's "Terms of Sale" provide that buyers "represent and warrant that [they] are buying products or services from the Website for your [their] personal or household use only, and not for resale or export." (Doc. 40-5 at 3.) It asserts that HPFY's invoices, attached to the AC as Exhibit F, "incorporate[] HPFY's standard terms and conditions" because they contain a link to those terms. *See* Doc. 43 at 4; Doc. 34-7. Plaintiffs claim there are no terms and conditions on the invoices, however, they acknowledge there is a link to HPFY's terms of sale. "Although the broader contents of [HPFY's] website," including its terms of sale, "may be relevant at a later stage of this litigation, 'allowing [Medline] to cherry pick portions of [the] website to introduce via a motion to dismiss simply because the complaint implicates [that website] would convert an examination of the complaint into full-blown summary judgment analysis.'" *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 805 (N.D. Ill. 2022) (quoting *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011)) (third and fourth alterations in original).

On February 23, 2021, Northeast Pharma received an Amazon-generated email with the subject line: "Notice: Policy Warning[.]" (Doc. 34-14 at 2.) The email stated:

Hello,

We removed some of your listings because we received a report from a rights owner that they may infringe the rights owner's trademark. The rights owner communication about the alleged infringement and the listings we removed are at the bottom of this message.

Why did this happen?

We received a report from a rights owner that one or more of your listings are inauthentic. Listing content infringing on the intellectual property of others is against our policies.

We're here to help.

If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property Policy" in Seller Central Help [].

. . .

If you think that the rights owner has made an error in sending the notice, please reach out to the rights owner and ask them to submit a retraction of this notice. We may only accept retractions that the rights owner submits to us directly. We do not accept forwarded or attached retractions.

These are the rights owner's contact details:

–Michael Murphy

–amazon@medline.com

For any other reason, please explain to us why you were warned in error so that we can investigate the case.

What happens if I do not provide the requested information?

Your listings will remain inactive. We reserve the right to destroy the inventory associated with this violation if proof of authenticity is not provided within 60 days. Violating this policy may also result in the loss of selling privileges or other legal consequences.

ASIN: B000KHKHXBC

Infringement type: Counterfeit

Trademark asserted: 86488830

Complaint ID: 8029801491

(Doc. 34-13 at 2) (the "February Amazon Email").

Thereafter, Amazon removed Northeast Pharma's listing from its website. Northeast Pharma immediately pursued both avenues for appeal set forth in the February Amazon Email.

On February 25, 2021, James Becker, Director of Business Development for Northeast Pharma, sent an email to Mr. Murphy, stating that Northeast Pharma was willing to provide Medline with invoices and the names of the account representatives at HPFY who originally sold the products to it. When no response was received, Mr. Becker sent a follow-up email on March 3, 2021. At the same time, Northeast Pharma pursued Amazon's appeal process and provided Amazon with invoices demonstrating that the products were originally purchased from an "authorized Medline reseller." (Doc. 34 at 8, ¶ 30.) It provided a Bill of Lading for each shipment directly from Medline to Northeast Pharma.

Amazon's policies do not treat an allegedly unauthorized resale as an intellectual property infringement or counterfeiting:

> **Exclusive or Selective Distribution:** Amazon respects a manufacturer's right to enter into exclusive distribution agreements for its products. However, violations of such agreements do not constitute intellectual property rights infringement. As the enforcement of these agreements is a matter between the manufacturer and the retailers, it would not be appropriate for Amazon to assist in enforcement activities.
>
> Please review the Amazon Intellectual Property Policy to learn more about different infringement types.

(Doc. 34-14 at 2.)

Two days after Plaintiffs' submission, "Amazon was able to verify that the products were indeed authentic Medline products and [it] granted Northeast Pharma's appeal and sent an email notifying Northeast Pharma that it was permitted to relist and continue to offer these specific Medline perineal bottles products for sale[.]" (Doc. 34 at 8-9, ¶ 31.)

On March 8, 2021, Mr. Becker received a letter from Mr. Murphy, dated March 1, 2021, with the subject line: "Medline Industries, Inc. – Tortious Interference with Contract[.]" (Doc. 34-17 at 3.) The letter stated in relevant part:

6

> All Medline Authorized Internet Dealers are required to execute an Agreement whereby they agree to the manner in which they must promote and sell Medline products on the Internet in order to maintain and foster Medline brand equity. Medline Distributors execute Authorized Distributor Agreements that prohibit them from selling Medline products to dealers who offer the products for resale on the Internet, unless those dealers have been approved as Medline Authorized Internet Dealers. Therefore, Unauthorized Resellers who induce Authorized Medline Distributors to sell Medline products to them for resale on the Internet tortiously interfere with the Distributor Agreement.
>
> Medline has confirmed that you are not authorized to sell Medline products. As such, Medline demands that you discontinue your tortious conduct, and notify the undersigned of your compliance by **March 8, 2021**. Nothing herein is intended by us, nor should it be construed by you as a waiver or relinquishment of any rights or remedies which our client may have in this matter, and all such rights and remedies are hereby specifically reserved, including, but not limited to, contacting your internet service provider to take further action and an accounting of damages in the event that litigation becomes necessary.

*Id.*

Northeast Pharma immediately attempted to contact Mr. Murphy but was only able to speak with a paralegal. In an email dated March 8, 2021, Mr. Becker wrote to Mr. Murphy, "[w]e have disabled all Medline offerings, and will remove the affected items on Amazon.com, pending the approved reseller process with Medline being completed." (Doc. 34-18 at 2.) Mr. Murphy responded the same day and stated that he would "pass [their] info along." *Id.*

Plaintiffs contend that, by this time, Medline was aware of the following:

- Medline had directly shipped its products to Northeast Pharma in Vermont;
- Medline told Amazon that the products "were counterfeit";
- Northeast Pharma "successfully demonstrated to Amazon that the product[s] w[ere] not counterfeit[;]"
- Northeast Pharma stated it "would remove its offers for any Medline brand products on Atlantic Pharma's Amazon storefront[;]" and
- Northeast Pharma demonstrated a willingness to cooperate in good faith with Medline.

7

(Doc. 34 at 10, ¶ 35.)

Plaintiffs further assert that Medline was aware that Northeast Pharma was the real party in interest for the Atlantic Pharma storefront, that Northeast Pharma was located in Vermont, and that "suspension of the Atlantic Pharma storefront was negatively impacting a Vermont business." (Doc. 34 at 10, ¶ 36.)

On April 1, 2021, Medline filed another counterfeit report with Amazon (the "April Complaint"). The April Complaint triggered a "heightened level of scrutiny and Amazon completely shut down Northeast Pharma's seller storefront on Amazon.com[,]" *id.* at 10-11, ¶ 37, suspending all of Northeast Pharma's listings on Amazon's website and freezing its Amazon seller account funds, thus preventing Northeast Pharma from paying vendors, other business obligations, and payroll. *Id.* at 11, ¶ 37. The suspension "brought [Atlantic Pharma's storefront] operations to a halt" from April 23, 2021 until May 5, 2021. *Id.* at ¶ 38.

Northeast Pharma alleges that it contacted Medline to resolve the situation. On April 23, 2021, Mr. Becker emailed Mr. Murphy and others at Medline and advised: "I have thirty employees I am sending home for the day since the company is shut down." (Doc. 40-3 at 4.) On April 26, 2021, Mr. Becker emailed Mr. Murphy and stated, among other things:

> [a]s of this morning, the account is still deactivated and I had to tell our 30 staff members that they could not come to work today (for the third day since we have weekend shifts). This issue is rapidly becoming a significant financial hardship for many of our staff members and needs to be resolved.

*Id.* at 2.

According to Plaintiffs, "Medline's second repeated counterfeit claim to Amazon is identical to its initial claim that was quickly disproven as Northeast Pharma was not selling counterfeit items." (Doc. 34 at 11, ¶ 39.) Northeast Pharma underwent "a labor-intensive process with Amazon as part of the second review process[.]" *Id.* at ¶ 40. Six weeks later, Northeast Pharma succeeded "in proving that it was not selling counterfeit items and violated none of Amazon['s] policy restrictions. *Id.*

On June 1, 2021, Amazon conducted a further investigation of the authenticity of

8

Northeast Pharma's inventory of Medline's perineal bottles. Amazon concluded that the bottles were authentic and again authorized Northeast Pharma to offer the products on its website. Plaintiffs allege that Amazon reached this conclusion based on Northeast Pharma's submission of invoices from HPFY, Bills of Ladings from Medline to Northeast Pharma, and because HPFY is an authorized reseller of Medline products.

As a result of Medline's acts and omissions, Plaintiffs allege that Amazon suspended Plaintiffs' storefront from April 23, 2021 until May 5, 2021 and that "Northeast Pharma suffered damages, including but not limited to, lost profit, lost subscribers and customer goodwill, inability to sell lawful products, and damage to reputation." (Doc. 34 at 11-12, ¶ 40.)

The AC alleges two claims against Medline: tortious interference with contract (Count I) and defamation (Count II).

## III.  Conclusions of Law and Analysis.

### A.  Whether the Court Has Personal Jurisdiction Over Medline.

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "In evaluating whether the requisite showing has been made, [the court] construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiff[]." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

"The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (citation omitted). "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks omitted). In this case, Medline did not submit any affidavits and neither party requested an evidentiary hearing. "Until an evidentiary hearing is held, . . . the

plaintiff need make only a prima facie showing that jurisdiction exists[.]" *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

Medline asserts that it lacks minimum contacts with Vermont and therefore the court's exercise of personal jurisdiction over it would offend Due Process. In support of this contention, Medline points out that its communications with Amazon, which constitute the conduct that allegedly gives rise to liability, took place outside the state of Vermont with a non-Vermont party. It further contends that shipment of Medline products to Plaintiffs in Vermont cannot establish the requisite minimum contacts because Plaintiffs' claims do not arise out of this conduct.

"In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, [the court] look[s] to the law of the forum state to determine whether a federal district court has personal jurisdiction[.]" *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (citing Fed. R. Civ. P. 4(k)(1)(A)). In Vermont, a court may exercise personal jurisdiction over a non-resident defendant "to the full extent permitted by the . . . Due Process Clause" of the Fourteenth Amendment. *State v. Atl. Richfield Co.*, 2016 VT 22, ¶ 10, 201 Vt. 342, 349, 142 A.3d 215, 220 (internal quotation marks omitted); *see also In re Roman Cath. Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 38 (2d Cir. 2014) ("Vermont's long-arm statute[] . . . reflects a clear policy to assert jurisdiction over individual defendants to the full extent permitted by the Due Process Clause.") (internal quotation marks omitted).[3] As a result,

---

[3] For this reason, Medline's reliance on *Careful Shopper, LLC v. TP-Link USA Corp.*'s personal jurisdiction analysis is misplaced. New York's long-arm statute differs from Vermont's in that "a non-resident defendant is subject to jurisdiction for torts committed out-of-state if (1) the defendant 'transacts any business' in the state; and (2) there is an 'articulable nexus' or 'substantial relationship' between defendant's in-state activity and the claim asserted." *Careful Shopper, LLC v. TP-Link USA Corp., et al.*, No 18-cv-3019 (RJD) (RML), slip op. at 4-5 (E.D.N.Y. Sept. 30, 2019) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60, 66 (2d Cir. 2012)). In that case, although the tortious activity centered on allegedly false reports made to Amazon, the "products were at all relevant times physically held in Amazon's warehouses[,]" *id.* at 3, and plaintiff presented no evidence that defendant's representative, who was "monitoring unauthorized third-party sales of [d]efendant's products[,]" "had any knowledge that he was purchasing goods from a New York-based company[,]" or that plaintiff "was located in New York." *Id.* at 6.

"the first part of [the] inquiry—the interpretation of the Vermont law governing service of process—merges with the second part of the jurisdictional test: whether the court's exercise of personal jurisdiction over the defendant satisfies the requirements of due process." *Metro. Life Ins. Co.*, 84 F.3d at 567. This "analysis consist[s] of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).

### 1. Whether Medline Has Sufficient Minimum Contacts with Vermont.

"[A] State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (second alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *In re Terrorist Attacks*, 714 F.3d at 673. In the instant case, only specific personal jurisdiction is alleged.

Specific jurisdiction "exists when a forum exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum[.]" *Id.* at 673-74 (alteration and internal quotation marks omitted). "The inquiry whether a forum [s]tate may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation. For a [s]tate to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum [s]tate." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (citations and internal quotation marks omitted).

There must be "'some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws.'" *Goodyear*, 564 U.S. at 924 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (alteration in original)); *see also Walden*, 571 U.S. at 286 ("A

11

forum [s]tate's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."); *In re Terrorist Attacks*, 714 F.3d at 674 ("For the purpose of establishing specific personal jurisdiction, the necessary fair warning requirement is satisfied if the defendant has purposefully directed his [or her] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.") (internal quotation marks omitted). This analysis "looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. The "foreseeability of causing injury in another State[,]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (emphasis omitted), will not alone suffice, and "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. In addition, it is "insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016) (internal quotation marks omitted).

If the conduct that gives rise to liability occurs entirely outside the forum, "courts may employ the effects test, which permits a court to assert specific personal jurisdiction over a defendant 'if the defendant expressly aimed its conduct at the forum.'" *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 203 (S.D.N.Y. 2018) (quoting *Licci*, 732 F.3d at 173). "The 'effects test' theory of personal jurisdiction is typically invoked where the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (internal quotation marks and citation omitted). This test requires the defendant's minimum contacts with the forum to have "arisen out of contacts that the defendant *himself*, as opposed to the plaintiff or third parties, created with the forum." *Dennis*, 343 F. Supp. 3d at 206 (internal quotation marks omitted).

In *Calder v. Jones*, the Supreme Court upheld the exercise of specific jurisdiction over non-resident defendants who published an allegedly libelous article about a California resident. 465 U.S. 783, 789 (1984). As the Court observed:

> The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons. Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California. In this way, the "effects" caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.

*Walden*, 571 U.S. at 287-88 (citations omitted).

Medline argues that *Calder* is distinguishable and its shipment of products to Northeast Pharma in Vermont does not establish minimum contacts because Medline did not have a contract with Plaintiffs and because the shipment of goods does not give rise to liability. Although this may arguably be true with regard to the February Complaint, it is not true of the April Complaint.[4] The AC alleges that "Northeast Pharma was the party in interest for the Atlantic Pharma storefront" and "was located in Vermont, the product at issue was warehoused in Vermont, and the suspension of the Atlantic Pharma storefront was negatively impacting a Vermont business." (Doc. 34 at 10, ¶ 36.)

On or about March 1, 2021, Medline sent Plaintiffs a cease and desist letter, claiming that Plaintiffs were improperly interfering with an "Authorized Distributor

---

[4] For this reason, the cases Medline cites wherein the only cause of action was an allegedly defamatory statement made to Amazon are distinguishable. *See* Doc. 40 at 14-15 (citing *Careful Shopper*, slip op. at 1-3; *Common Cents Distribs., LLC v. CURLS Beauty Brands, LLC*, 2021 WL 4226182, at *3-4 (S.D.N.Y. Sept. 15, 2021); *Real Selling Grp. LLC v. ESN Grp., Inc.*, 2021 WL 535748, at *6 (S.D.N.Y. Feb. 12, 2021)).

Agreement[,]" but making no claim and expressing no concerns regarding counterfeiting, inauthentic products, or trademark infringement. *Id.* at 9, ¶ 32.

By the time of the April Complaint, Medline knew or reasonably should have known that it was shipping large quantities of its perineal bottles to an unauthorized distributor in Vermont, that the quantities of items shipped belied personal use, that its allegedly false communications to Amazon that Plaintiffs were selling counterfeit products arose out of those shipments and pertained to them, and that its allegedly false and defamatory statements affected the reputation of and caused financial harm to a company doing business in Vermont. Medline thereby created its *own* contacts with the forum.

Drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have plausibly alleged that Medline was not seeking to safeguard the authenticity of its products; it was seeking to disrupt a Vermont company's ability to re-sell its products on Amazon's website.

In *Calder*,

> California [wa]s the focal point both of the [libelous] story and of the harm suffered" because the defendants called California residents as sources for the allegedly defamatory article, "wrote the story about the plaintiff's activities in California; [] caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the [s]tate; and the 'brunt' of that injury was suffered by the plaintiff in that [s]tate.

*Walden*, 571 U.S. at 287 (first alteration in original). Similarly, in the instant case, by the time of the April Complaint, Plaintiffs plausibly allege that Medline directed its activities at the forum, knowing that a Vermont business would suffer injury in Vermont as a result of its false accusations of counterfeiting to Amazon. Accepted as true, these allegations plausibly allege the "minimum contacts" necessary for specific personal jurisdiction over Medline based on *Calder*'s "effects" test. *Calder*, 465 U.S. at 789.

### 2. Whether Exercising Personal Jurisdiction Over Medline is Reasonable.

Having concluded that "minimum contacts" exist, the court examines whether exercising personal jurisdiction over Medline comports with "traditional notions of fair

play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted). In making this determination, the court evaluates: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (internal quotation marks omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" *Bank Brussels Lambert*, 305 F.3d at 129.

In this case, the witnesses are located in Vermont as well as elsewhere. The documentary evidence is likely to be limited, and out-of-state discovery is likely to be minimal. "Although perhaps inconvenient, an exercise of jurisdiction is unlikely to substantially impact [Medline's] ability to protect [its] rights and interests." *Allen-Sleeper v. Fed. Express Corp.*, 2010 WL 3323660, at \*5 (D. Vt. Apr. 14, 2010). Medline's representatives may need to be present in Vermont for trial, but that burden is eased by "the conveniences of modern communication and transportation[.]" *Licci*, 732 F.3d at 174 (quoting *Metro. Life*, 84 F.3d at 574); *see also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010) ("In light of our holding that [the plaintiff] has made a threshold showing of minimum contacts at the first stage of the inquiry, . . . [the defendant's] generalized complaints of inconvenience arising from having to defend himself from suit in New York do not add up to a compelling case that the presence of some other considerations would render jurisdiction unreasonable.") (internal quotation marks and citation omitted).

Plaintiffs have chosen Vermont as their forum, and Vermont has an interest in adjudicating a case that involves alleged harm to a Vermont business and its Vermont employees. *See CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, 1998 WL 512951, at \*6 (S.D.N.Y. Aug. 18, 1998) ("In evaluating the litigants' interests, there is a strong

presumption that a court should honor the plaintiff's choice of forum."); *see also Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984) (holding "it is beyond dispute that [a state] has a significant interest in redressing injuries that actually occur within the [s]tate.").

In evaluating the interstate judicial system's interest in obtaining efficient resolution of controversies, courts typically consider "where witnesses and evidence are likely to be located." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 245 (2d Cir. 1999) (internal quotation marks omitted). Here, the witnesses and evidence may be found in several states including Vermont. All states, including Vermont, share a common interest in ensuring that their residents have a forum in which to bring their tort claims.

Based on the totality of the circumstances, the exercise of specific personal jurisdiction over Medline is reasonable and comports with the Due Process Clause. Medline's motion to dismiss for lack of personal jurisdiction is therefore DENIED.

## B.  Whether the Court Should Dismiss the AC for Failure to State a Claim.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a complaint is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.*

The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff will prevail on his or her claims. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017). "When considering a motion to dismiss pursuant to Rule

12(b)(6), the district court . . . is required to accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015).

### 1.   Whether Plaintiffs Plausibly Plead a Claim for Tortious Interference with Contract (Count I).

Plaintiffs allege that Medline knowingly made false complaints of counterfeiting to Amazon "for the improper purpose of causing the suspension of Northeast Pharma's Amazon storefront[,]" which "interfered with Northeast Pharma's business relationship with Amazon and proximately caused Northeast Pharma's temporary suspension." (Doc. 34 at 14, ¶ 49.) Medline seeks dismissal of this claim because its complaints to Amazon were not improper and because Plaintiffs have not alleged that Medline's conduct caused a breach of Plaintiffs' contract with Amazon.

The Vermont Supreme Court has adopted § 766 of the Restatement (Second) of Torts which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Williams v. Chittenden Tr. Co.*, 484 A.2d 911, 913 (Vt. 1984) (quoting Restatement (Second) of Torts § 766). The tort requires Plaintiffs to allege that Medline "intentionally and improperly induced" Amazon not to perform its contract with Plaintiffs. *Gifford v. Sun Data, Inc.*, 686 A.2d 472, 473 (Vt. 1996). It also requires Plaintiffs to allege Medline's interference was "wrongful or improper by some measure beyond the fact of interference itself[.]" *Kollar v. Martin*, 706 A.2d 945, 946 (Vt. 1997) (citation omitted). Medline must not only have "[k]nowledge of the existence of the contract" between Plaintiffs and Amazon, *Williams*, 484 A.2d at 914, but its interference must have resulted in Plaintiffs' pecuniary loss. *See* Restatement (Second) of Contracts § 346(1) ("The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged.").

Vermont courts assess impropriety under § 767 by considering:

a)  the nature of the actor's conduct,
b)  the actor's motive,
c)  the interests of the other with which the actor's conduct interferes,
d)  the interests sought to be advanced by the actor,
e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
f)  the proximity or remoteness of the actor's conduct to the interference, and
g)  the relations between the parties.

*Gifford*, 686 A.2d at 474 n.1 (quoting Restatement (Second) of Torts § 767); *see also id.* at 474 ("Our analysis of [impropriety] is guided by § 767 of the Restatement (Second) of Torts[.]"). "Actions are improper if they are not justified." *Skaskiw v. Vt. Agency of Agric.*, 2014 VT 133, ¶ 26, 198 Vt. 187, 200, 112 A.3d 1277, 1288.

Medline asserts that its complaints to Amazon were justified because Plaintiffs' Medline 3-packs materially differed from Medline's own product and thus constituted "an infringement upon Medline's trademark." (Doc. 40 at 19.) It argues that the changed model numbers in Plaintiffs' Amazon listing[5] resulted in a product "materially different than the product listed on Plaintiffs' storefront." *Id.* at 18. Although Medline contends that "courts have found 'counterfeiting' when a third party repackages and sells good[s] in contravention of a manufacturer's efforts to restrict the resale of its goods[,]" (Doc. 43 at 8), none of the cases it cites goes this far. In each case, in addition to legitimate concerns regarding the authenticity of the product, there was the potential to deceive the consumer as to the product's origin.

---

[5] The AC identifies the individual Medline bottles Plaintiffs purchased from HPFY as model number DYND70125. *See* Doc. 34 at 3, ¶ 10; Doc. 34-7 at 2-4. In their Amazon listing, however, Plaintiffs identify their 3-pack as model number DYND70123, *see* Doc. 34-9 at 1-2, which Medline asserts "is Medline's unique model number for authorized Medline 3-packs." (Doc. 40 at 18.) It is not clear whether the model numbers differ because of the number of units. Medline does not contend the products differed from its "Medline Perineal Bottle With Screw Top" or that the products were inauthentic, not genuine, or fake. It also does not allege that Plaintiffs altered the products' serial numbers. *See Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 231 (2d Cir. 2011) ("In light of Bel Canto's policy regarding altered serial numbers, any products sold by [d]efendants that bear altered serial numbers lack warranty and related services, and so are not 'genuine' Bel Canto products.").

For example, in *Seiko Epson Corp. v. Koshkalda*, the Ninth Circuit affirmed the district court's award of statutory damages for the use of counterfeit marks for printer ink where the defendants "repackaged, reprogrammed, and relabeled [printing] cartridges, changed 'Best Before' dates, and degraded the quality of the cartridges and ink before selling the cartridges to unsuspecting customers[,]" holding that gray market goods "repackaged in a way that will deceive consumers" constitute a counterfeit product. 799 F. App'x 463, 466 (9th Cir. 2019) (internal quotation marks omitted) (quoting 2 Anne Gilson LaLaonde, *Gilson on Trademarks* § 5.19(3)(c)(ii), at 5-229 (Matthew Bender 2019)).

Similarly, in *Coty Inc. v. Cosmopolitan Cosmetics Inc.*, the plaintiffs adequately pled counterfeiting when they alleged that the defendant sold units of their fragrances from which "production codes" had been removed, obscured, stickered, or otherwise mutilated the products and because the plaintiffs alleged that the products bore their "registered trademark, [were] not authorized for resale, and [were] sold in an 'intentionally fraudulent' manner by which to trick consumers into believing they [were] the 'genuine article' despite the material difference[.]" 432 F. Supp. 3d 345, 353 (S.D.N.Y. 2020).

In *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924), the plaintiff sought to restrain "alleged unlawful uses of [its] registered trade-marks" where the defendant purchased the plaintiff's trademarked perfume and powder, sold it in smaller bottles, and indicated on the rebottled products that the contents were its own and were independently rebottled. *Id.* at 366.

Finally, in *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1086 (9th Cir. 1998), the court noted that the defendant's repackaging of the plaintiff's original product "may cause confusion by the public as to [the defendant's] role in repackaging the figurines in allegedly inadequate, clear plastic blister packs" because the defendant did not disclose its repackaging of the figurines. The *Enesco* court, however, stated that "whether the public is likely to be confused as a result of the lack of quality control" was "[t]he critical issue[,]" and noted that "the 'quality control' cases where trademark

19

infringement has been found all involved some defect (or potential defect) in the product itself that the customer would not be readily able to detect." *Id.* at 1087.

The cases Medline cites thus fall far short of establishing that repackaging is the equivalent of counterfeiting especially where is no evidence that Plaintiffs altered the product, changed its quality, or attempted to deceive the public regarding its characteristics or its origins. Plaintiffs therefore plausibly allege that Medline's interference was improper by asserting Medline made false statements regarding the authenticity of the products it shipped to Plaintiffs. Conversely, Medline fails to establish that its interference was proper as a matter of law.

A tortious interference with contract claim also requires "that [Medline] intentionally and improperly induced [a third-party] not to perform its contract." *Gifford*, 686 A.2d at 473; *see also Williams*, 484 A.2d at 913 ("[T]o be liable for interference with a contractual relationship, the defendant must have intentionally and improperly induced or caused the owner not to perform under its contract with the plaintiff."). Plaintiffs have plausibly alleged that by the April Complaint, Medline knew Plaintiffs had a contractual relationship with Amazon and that Amazon had suspended Atlantic Pharma's Amazon storefront on two occasions solely because of Medline's allegedly improper claim of counterfeiting.

Because Plaintiffs have plausibly alleged that Medline intentionally and improperly induced Amazon not to perform its contract with Plaintiffs, Medline's motion to dismiss Plaintiffs' tortious interference with contract claim (Count I) is DENIED.

### 2. Whether Plaintiffs Plausibly Plead Defamation (Count II).

Plaintiffs allege that Medline's false complaints to Amazon regarding their sale of counterfeit products constituted libel. In Vermont, the elements of defamation, "which comprises libel and slander," are:

(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

20

*Russin v. Wesson*, 2008 VT 22, ¶ 5, 183 Vt. 301, 303, 949 A.2d 1019, 1020 (quoting *Lent v. Huntoon*, 470 A.2d 1162, 1168 (Vt. 1983)).

Medline argues that Plaintiffs' defamation claim must be dismissed because Plaintiffs fail to plausibly allege that Medline's counterfeit complaints to Amazon were false. Alternatively, Medline argues that its complaints to Amazon are absolutely or conditionally privileged. As a threshold issue, Medline contends that Plaintiffs' AC must be dismissed because Plaintiffs have failed to "provide the actual publication that they allege Medline made to Amazon." (Doc. 40 at 23.) Although the AC does not recite Medline's exact statements to Amazon, Plaintiffs assert they received a communication from Amazon that Medline had accused Plaintiffs of: "Infringement type: Counterfeit[,]" (Doc. 34-13 at 2), and which stated that Amazon "received a report from a rights owner that [Plaintiffs' products] may infringe the rights owner's trademark." *Id.* This is sufficiently specific to provide notice to Medline of the alleged defamatory statement. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 251 (2d Cir. 2017) ("Our defamation jurisprudence has emphasized that 'the complaint [must] afford defendant sufficient notice of the communications complained of to enable him to defend himself.'") (alteration in original) (quoting *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986)).

Plaintiffs allege that Medline's accusations "falsely charged Plaintiffs with a serious crime or crimes, to wit: counterfeiting, a form of fraud, undertaken by means of interstate wire services, itself a federal felony." (Doc. 34 at 15, ¶ 54.) Statements that falsely accuse a plaintiff of committing a crime are defamatory per se. *See Lent*, 470 A.2d at 1167-68 ("Spoken defamation involving [] imputation of a crime" was "identified at English common law as more serious than others and [] [was] held to be actionable per se[,]" and Vermont defamation law "must be gleaned from nineteenth century case law."); *see also* Defamation: A Lawyer's Guide § 110: Libelous Imputations of Criminality ("All imputations of crime are deemed libelous unless the offense charged is so trivial as to 'not be regarded as socially or morally reprehensible[.]'") (quoting Restatement (Second) of Torts § 569, cmt. d).

Medline tacitly concedes that its accusation does not satisfy Amazon's definition of "counterfeiting" (Doc. 43 at 7) but argues this is immaterial because courts have found both "trademark infringement" and "counterfeiting" on a similar basis. The court has addressed the cases Medline cites, found them inapposite, and has rejected Medline's contention they establish Plaintiffs' conduct was the equivalent of either counterfeiting or trademark infringement as a matter of law.

To establish trademark infringement under 15 U.S.C. § 1114(1), "in addition to demonstrating that the plaintiff's mark is protected, the plaintiff must prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). "The likelihood of confusion is determined by application of the eight-factor balancing test introduced in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961)[.]" *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 466 (S.D.N.Y. 2011). Those factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id.* (citing *Starbucks*, 588 F.3d at 115). "No single factor is dispositive, and these factors are non-exclusive of other considerations a court may take into account." *Id.* (citing *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004)).

Under the Lanham Act, a "counterfeit" product is one that is "substantially indistinguishable" from a genuine product as judged "from the standpoint of an average purchaser." *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 526, 528 (2d Cir. 1983). In general, "counterfeiting" requires "deceptively suggesting an erroneous origin; fake" in order to "trick the consumer into believing he or she is getting the genuine article, rather than a colorable imitation." *Antetokounmpo v. Paleo Prods. LLC*, 2021 WL 4864537, at

*2-3 (S.D.N.Y. Oct. 18, 2021).

Medline does not contend Plaintiffs sought to deceive Amazon consumers as to the products' authenticity or origin. It has thus failed to establish that its statements to Amazon were true as a matter of law. Plaintiffs have thus plausibly alleged Medline made false and defamatory statements regarding Plaintiffs' resale of the Medline perineal bottles that caused Plaintiffs reputational harm. *See CT Espresso LLC v. Lavazza Premium Coffees Corp.*, 2022 WL 17156759, at *2 (S.D.N.Y. Nov. 22, 2022) ("[Plaintiff] has stated a claim for defamation. [Plaintiff] alleges that the defendants submitted complaints to Amazon stating that [plaintiff] was selling 'counterfeit' [defendants] products. This statement is defamatory *per se*, and [plaintiff] alleges that the statement as false.").

### a. Whether Medline's Complaints to Amazon were Absolutely Privileged.

Medline relies on *TP Link USA Corp. v. Careful Shopper LLC*, 2020 WL 3063956, at *9 (C.D. Cal. Mar. 23, 2020) for its argument that its complaints to Amazon are "subject to an absolute privilege because they were pre-litigation statements." (Doc. 40 at 27). There, the court dismissed defamation counterclaims because it determined that the communications to Amazon identifying the seller's listings as counterfeit constituted pre-litigation conduct falling within California's anti-SLAPP statute.

Vermont's anti-SLAPP statute is not at issue here, although "Vermont law recognizes a litigation privilege that extends to statements within documents filed in a judicial proceeding." *Kucera v. Tkac*, 2014 WL 6463292, at *18 (D. Vt. Nov. 17, 2014) (collecting cases). This "absolute privilege" applies to statements and recordings "made as preliminary steps to judicial or quasi-judicial proceedings" including parole violations and child abuse allegations. *Couture v. Trainer*, 2017 VT 73, ¶ 7, 205 Vt. 319, 326-27, 174 A.3d 1245, 1249-50.[6] Consistent with "courts in many other states [which] have

---

[6]     "[T]he Restatement supports the extension of absolute privilege to 'communications preliminary to a proposed judicial proceeding': 'A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in

concluded that absolute privilege is the appropriate level of protection for statements made in the preliminary stages of judicial and quasi-judicial proceedings[,]" *id.* at ¶ 127, 205 Vt. at 326, 174 A.3d at 1249 (collecting cases), the privilege is generally confined to existing or imminent litigation and does not extend to any matter which might in the future be brought before a court.

Medline's complaints to Amazon were not made in connection with a judicial or quasi-judicial proceeding. *See CT Espresso*, 2022 WL 17156759, at *3 (declining to extend New York's litigation privilege to statements made in an Amazon counterfeit complaint where the plaintiffs did not allege that Amazon's complaint process was "designed to administer highly regulated activity" or that it was "implemented to perform any governmental function" as required to be considered "quasi-judicial"). As one court observed, "[i]f every communication made to Amazon pursuant to the notice and takedown procedures were entitled to litigation privilege regardless of whether they were made during the pendency of litigation, potential litigants would have ample opportunity to engage in gamesmanship and abuse the notice and takedown process." *Hotaling & Co., LLC v. LY Berditchev Corp.*, 2022 WL 1134851, at *3 n.5 (D.N.J. Apr. 18, 2022).

Medline has the burden of proving its statements to Amazon were absolutely privileged. *See Douglas v. Windham Super. Ct.*, 597 A.2d 774, 780 (Vt. 1991) ("The party seeking to invoke the privilege bears the burden of justifying its application.") (quoting *King v. Conde*, 121 F.R.D. 180, 189 (E.D.N.Y. 1988)). It has not satisfied this burden.

### b.    Whether Medline's Complaints to Amazon were Protected by the Legitimate Business Interests Privilege.

Medline asserts that the February and April Complaints are covered by a conditional privilege available in Vermont "to protect . . . legitimate business interests[,]"

---

communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.'"

*Couture v. Trainer*, 2017 VT 73, ¶ 13, 205 Vt. 319, 326, 174 A.3d 1245, 1249.

recognized in the Restatement (Second) of Torts § 595.[7] *See Lent*, 470 A.2d at 1169 (holding that the privilege to protect legitimate business interests, as recognized in Restatement (Second) of Torts § 595, is applicable in Vermont). The privilege to publish information in order to:

> protect legitimate business interests applies as long as the [person communicating] reasonably believes that [the] information affects a sufficiently important interest of the recipient or a third person and the [person communicating] was either under a legal duty to communicate the information to the recipient or communicated the information in response to a request.

*Soojung Jang v. Trs. of St. Johnsbury Acad.*, 2018 WL 4941784, at *6 (D. Vt. Oct. 12, 2018) (internal quotation marks omitted) (quoting *Skaskiw*, 2014 VT 133, ¶ 12, 198 Vt. at 193, 112 A.3d at 1284 n.2) (alterations in original).

Because the privilege is conditional, a plaintiff may defeat it with a showing of common law malice. *Id.* Malice may be demonstrated in one of two ways: "'knowledge of the statement's falsity or with reckless disregard of the truth,' [] or 'conduct manifesting personal ill will, reckless or wanton disregard of plaintiff's rights, or carried

---

[7] The Restatement (Second) of Torts § 595 states:

> (1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

>> (a) there is information that affects a sufficiently important interest of the recipient or a third person, and

>> (b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.

> (2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that

>> (a) the publication is made in response to a request rather than volunteered by the publisher or

>> (b) a family or other relationship exists between the parties.

> Comment d to the Restatement indicates that "a statement made for the protection of a lawful business, professional, property or other pecuniary interest and in some instances, a domestic interest, comes within the rule stated in this Section.

out under circumstances evidencing insult or oppression[.]'" *Crump v. P&C Food Mkts., Inc.*, 576 A.2d 441, 447 (Vt. 1990) (quoting *Lent*, 470 A.2d at 1169); *see also Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 155 (S.D.N.Y. 2016) (explaining that qualified privilege defenses are "not appropriate for resolution on a motion to dismiss" because "a claim of qualified privilege may be rebutted") (quoting *Roberti v. Schroder Inv. Mgmt. N. Am., Inc.*, 2006 WL 647718, at *8 (S.D.N.Y. Mar. 14, 2006) (internal quotation marks omitted)).

Medline asserts that its complaints to Amazon furthered its legitimate business interest in "protecting its trademark and general reputation[,]" (Doc. 40 at 29), but it does claim a "legal duty to communicate the information to the recipient" or claim it provided the information in response to Amazon's request. Although a party has a right to protect its intellectual property rights, Medline has not established either trademark infringement or counterfeiting or the risk of either as a result of Plaintiffs' reselling actions. Its cease and desist letter to Plaintiffs stated it was concerned about Plaintiffs' lack of status as an authorized reseller; it did not mention any other concerns. As the party asserting the conditional privilege, Medline has the obligation to demonstrate it applies. It has not done so at this juncture. *See Douglas*, 597 A.2d at 780.

Even if Medline could establish a privilege as a matter of law, at the pleading stage, Plaintiffs plausibly allege that Medline "acted maliciously and intentionally in submitting a counterfeit report to Amazon after Medline indisputably knew that Northeast Pharma was not selling Medline counterfeit products[,]" (Doc. 34 at 14, ¶ 48) and that it did so "for the improper purpose of causing the suspension of Northeast Pharma's Amazon storefront[.]" *Id.* at ¶ 49. Plaintiffs cite Amazon's own definition of counterfeiting and Medline's knowledge of that definition to support their contention that Medline knew its accusations were false. Plaintiffs further allege that they notified Medline that its false allegations were harming their business and employees, and Medline refused to rectify that harm, thereby allegedly demonstrating a reckless disregard for Plaintiffs' rights.

Because Plaintiffs have plausibly alleged per se defamatory statements and actual

malice, and because Medline has not shown that its statements were privileged as a matter of law, Medline's motion to dismiss Plaintiffs' defamation claim (Count II) is DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Medline's motion to dismiss. (Doc. 40.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 26th day of May, 2023.

_____

Christina Reiss, District Judge
United States District Court