UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2024 JAN -2  PM 4: 40

LAW

GIZMOCUP L.L.C., doing )
business as Northeast Pharma and )
Atlantic Pharma Co LLC, )
 )
Plaintiffs/Counter Defendants, )
 )
v. )            Case No. 2:21-cv-00213
 )
MEDLINE INDUSTRIES INC., )
 )
Defendant/Counter Claimant/ )
Third-Party Plaintiff, )
 )
v. )
 )
HEALTH PRODUCTS FOR YOU, )
 )
Third-Party Defendant. )

**OPINION AND ORDER GRANTING THIRD-PARTY DEFENDANT'S MOTION
TO DISMISS DEFENDANT/COUNTER CLAIMANT/THIRD-PARTY
PLAINTIFF'S COMPLAINT**
(Doc. 72)

Plaintiffs/Counter Defendants Gizmocup L.L.C., d/b/a Northeast Pharma

("Northeast Pharma") and Atlantic Pharma Co LLC ("Atlantic Pharma") (collectively,

"Plaintiffs") bring this action against Defendant Medline Industries Inc. ("Medline"),

alleging tortious interference with contractual relations and defamation. Plaintiffs' claims

arise from a second complaint that Medline filed with Amazon.com ("Amazon")

regarding Plaintiffs' sale of Medline's products on Amazon's website. On June 22, 2023,

Medline filed a Third-Party Complaint against Health Products for You ("HPFY"),

alleging HPFY must indemnify Medline because HPFY resold Medline's products to

Plaintiffs in violation of HPFY's reseller agreement with Medline (the "Reseller

Agreement") and, but for that violation, Plaintiffs would have no cause of action against

Medline. HPFY opposes the motion and points out that none of Plaintiffs' claims arise out of its conduct; they are solely based upon Medline's alleged independent torts.

Pending before the court is HPFY's motion to dismiss Medline's Third-Party Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 72). HPFY argues that Medline's Third-Party Complaint fails to comply with the requirements of Fed. R. Civ. P. 14(a) because HPFY is not contractually obligated to indemnify Medline for Plaintiffs' claims. Medline opposed the motion on October 5, 2023, (Doc. 83), and HPFY replied on October 16, 2023, (Doc. 84), at which point the court took the pending motion under advisement.

Plaintiffs are represented by David M. Pocius, Esq., Dustin A. Lane, Esq., and James J. Becker, Esq. Medline is represented by Matthew B. Byrne, Esq., and Zachary M. Dayno, Esq. HPFY is represented by Ian P. Carleton, Esq., and Kevin A. Lumpkin, Esq.

## I.    Factual Background

The parties disagree regarding whether the court should rely on the allegations in Plaintiffs' Amended Complaint (the "AC") or those in Medline's Third-Party Complaint. Generally, a court's review of a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). Here, the Third-Party Complaint incorporates the AC by reference and thus the court considers the facts asserted in both.

### A.    Allegations in the AC.

Northeast Pharma is headquartered and incorporated in Vermont and specializes in the sale and distribution of consumer goods as a third-party seller on Amazon's website. In this capacity, Northeast Pharma is "a downstream purchaser that customarily listed and sold goods bearing the trademarks and other intellectual properties of manufacturers and other holders of intellectual property rights." (Doc. 34 at 2-3, ¶ 7.) Plaintiffs contend that

2

such sales are permitted by Amazon, provided the goods sold and delivered are authentic and intellectual property rights are not misused.

"Northeast Pharma routinely maintains over 500 product offerings or listings per day and averages between 1[,]500 and 2[,]000 orders per day" through the Atlantic Pharma storefront. *Id.* at 11, ¶ 38. To meet this demand, "it generally employs around [ten to fifteen] Vermont residents at a given time." *Id.*

Atlantic Pharma, incorporated in Delaware, is a wholly owned subsidiary of Northeast Pharma and "a flowthrough (pass-through) business entity that passes all its income, rights, assignments, and liabilities . . . to Northeast Pharma." *Id.* at 1, ¶ 2. Atlantic Pharma was "created by Northeast Pharma . . . for storefront presentational purposes" on Amazon. *Id.* at 2, ¶ 3. Atlantic Pharma does not have employees, a bank account, or business operations, and is a "mere alter ego" of Northeast Pharma. *Id.* Although Atlantic Pharma is "utilized" as the "namesake" for its sales on Plaintiffs' Amazon website, Plaintiffs assert that "all the contractual obligations and liabilities . . . are assigned and assumed by Northeast Pharma[,]" rendering Northeast Pharma the "true party in interest to Amazon's Business Solutions Agreement[.]" (Doc. 34 at 3, ¶ 8.) Northeast Pharma is "the primary account manager for . . . Atlantic Pharma's storefront." *Id.* at ¶ 9.

Medline is "a healthcare business that manufacture[]s and distributes medical supplies under several brand names including the 'Medline' brand" which is headquartered in Illinois and "purportedly incorporated in Delaware." *Id.* at 2, ¶ 4.

Plaintiffs allege that from April 2020 through February 2021, Northeast Pharma purchased over 10,000 Medline-branded perineal bottles from HPFY, which is located in Fairfield, Connecticut. HPFY advertised itself as "an Authorized Medline Retailer[,]"and Plaintiffs relied on this representation to "avoid any possibility of purchasing inauthentic or counterfeit products." *Id.* at 3-4, ¶¶ 10-11 (internal quotation marks and citation omitted).

Northeast Pharma ordered Medline perineal bottles through HPFY account representative Andy Mercier. Its initial purchase on April 9, 2020 was for 6,000 "Medline

3

Perineal Cleansing Bottle With Screw Top." *Id.* at 5, ¶ 15. "All 120 cases[,]" each case holding fifty bottles, were shipped, "freight prepaid, directly from Medline to Northeast Pharma in Vermont." *Id.* Due to the quantity of bottles ordered, Plaintiffs assert "it was evident that Northeast Pharma was purchasing" Medline products for resale. (Doc. 34 at 4, ¶ 13.) In fact, "Northeast Pharma specifically disclosed to Mr. Mercier that the products would be resold" and no HPFY representative "object[ed to] or warn[ed] against the practice." *Id.*

Because HPFY does not maintain an inventory of Medline perineal bottles, each of Plaintiffs' orders was directly shipped from Medline's warehouses to Northeast Pharma in Vermont. *Id.* at ¶ 12. Plaintiffs allege that Medline filled Plaintiffs' perineal bottle orders on four occasions. "At no point . . . did either HPFY or Medline ever directly inform or notify Northeast Pharma that the Medline perineal bottles purchased may be counterfeit." *Id.* at 5, ¶ 18.

In December 2020, Northeast Pharma began to offer Medline perineal bottles for resale in packs of three on Amazon's website. Plaintiffs allege that:

> Northeast Pharma believed it was purchasing authentic Medline perineal bottles from Medline, via its authorized retailer HPFY, in bulk. In turn, Northeast Pharma then assembled those perineal bottles in [three]-pack quantity packages, which consisted of three individual Medline brand perineal bottles that remained in their original labeling and condition as received directly from Medline. Northeast Pharma then affixed a required unique sticker, assigned by Amazon.com only to Northeast Pharma for this specific product offering, to the product for identification and tracking purposes. Amazon.com requires this type of labeling for the vast majority of health and personal care products for product safety compliance issues.

*Id.* at 6, ¶ 20.

Northeast Pharma allegedly did not "'rebrand[]' any Medline product or attempt[] to sell a counterfeit Medline product." *Id.* at ¶ 21. Rather, Plaintiffs assert that their resale practice "is a routine and customary practice performed by third party sellers, as well as Amazon itself, on the Amazon marketplace." (Doc. 34 at 6, ¶ 21.)

On February 23, 2021, Northeast Pharma received an Amazon-generated email with the subject line: "Notice: Policy Warning[.]" (Doc. 34-13 at 2.) The email stated:

4

Hello,

We removed some of your listings because we received a report from a rights owner that they may infringe the rights owner's trademark. The rights owner communication about the alleged infringement and the listings we removed are at the bottom of this message.

Why did this happen?

We received a report from a rights owner that one or more of your listings are inauthentic. Listing content infringing on the intellectual property of others is against our policies.

We're here to help.

If you need help understanding why your listings may infringe the intellectual property rights of others, please search for "Intellectual Property Policy" in Seller Central Help [].

. . .

If you think that the rights owner has made an error in sending the notice, please reach out to the rights owner and ask them to submit a retraction of this notice. We may only accept retractions that the rights owner submits to us directly. We do not accept forwarded or attached retractions.

These are the rights owner's contact details:

–Michael Murphy

–amazon@medline.com

For any other reason, please explain to us why you were warned in error so that we can investigate the case.

What happens if I do not provide the requested information?

Your listings will remain inactive. We reserve the right to destroy the inventory associated with this violation if proof of authenticity is not provided within 60 days. Violating this policy may also result in the loss of selling privileges or other legal consequences.

ASIN: B00KHKHXBC

Infringement type: Counterfeit

Trademark asserted: 86488830

Complaint ID: 8029801491

(Doc. 34-13 at 2) (the "February Amazon Email").

5

Thereafter, Amazon removed Northeast Pharma's listing from its website. Northeast Pharma immediately pursued both avenues for appeal set forth in the February Amazon Email.

On February 25, 2021, James Becker, Director of Business Development for Northeast Pharma, sent an email to Mr. Murphy, stating that Northeast Pharma was willing to provide Medline with invoices and the names of the account representatives at HPFY who originally sold the products to it. When no response was received, Mr. Becker sent a follow-up email on March 3, 2021. At the same time, Northeast Pharma pursued Amazon's appeal process and provided Amazon with invoices demonstrating that the products were originally purchased from an "authorized Medline reseller[.]" (Doc. 34 at 8, ¶ 30.) It provided a bill of lading for each shipment directly from Medline to Northeast Pharma.

Amazon's policies do not treat an allegedly unauthorized resale as an intellectual property infringement or counterfeiting:

> **Exclusive or Selective Distribution:** Amazon respects a manufacturer's right to enter into exclusive distribution agreements for its products. However, violations of such agreements do not constitute intellectual property rights infringement. As the enforcement of these agreements is a matter between the manufacturer and the retailers, it would not be appropriate for Amazon to assist in enforcement activities.
>
> Please review the Amazon Intellectual Property Policy to learn more about different infringement types.

(Doc. 34-14 at 2) (emphasis in original).

Two days after Plaintiffs' submission, "Amazon was able to verify that the products were indeed authentic Medline products and [it] granted Northeast Pharma's appeal and sent an email notifying Northeast Pharma that it was permitted to relist and continue to offer these specific Medline perineal bottles products for sale[.]" (Doc. 34 at 8-9, ¶ 31.)

On March 8, 2021, Mr. Becker received a letter from Mr. Murphy, dated March 1, 2021, with the subject line: "Medline Industries, Inc. – Tortious Interference with Contract[.]" (Doc. 34-17 at 3.) The letter stated in relevant part:

6

> All Medline Authorized Internet Dealers are required to execute an
> Agreement whereby they agree to the manner in which they must promote
> and sell Medline products on the Internet in order to maintain and foster
> Medline brand equity. Medline Distributors execute Authorized Distributor
> Agreements that prohibit them from selling Medline products to dealers
> who offer the products for resale on the Internet, unless those dealers have
> been approved as Medline Authorized Internet Dealers. Therefore,
> Unauthorized Resellers who induce Authorized Medline Distributors to sell
> Medline products to them for resale on the Internet tortiously interfere with
> the Distributor Agreement.
>
> Medline has confirmed that you are not authorized to sell Medline products.
> As such, Medline demands that you discontinue your tortious conduct, and
> notify the undersigned of your compliance by **March 8, 2021**. Nothing
> herein is intended by us, nor should it be construed by you as a waiver or
> relinquishment of any rights or remedies which our client may have in this
> matter, and all such rights and remedies are hereby specifically reserved,
> including, but not limited to, contacting your internet service provider to
> take further action and an accounting of damages in the event that litigation
> becomes necessary.

*Id.* (emphasis in original).

Northeast Pharma immediately attempted to contact Mr. Murphy but was only
able to speak with a paralegal. In an email dated March 8, 2021, Mr. Becker wrote to Mr.
Murphy, "[w]e have disabled all Medline offerings, and will remove the affected items
on Amazon.com, pending the approved reseller process with Medline being completed."
(Doc. 34-18 at 2.) Mr. Murphy responded the same day and stated that he would "pass
[their] info along." *Id.*

Plaintiffs contend that, by this time, Medline was aware of the following:

- Medline had directly shipped its products to Northeast Pharma in
  Vermont;

- Medline told Amazon that the products "were counterfeit";

- Northeast Pharma "successfully demonstrated to Amazon that the
  product[s] w[ere] not counterfeit";

- Northeast Pharma stated it "would remove its offers for any Medline
  brand products on Atlantic Pharma's Amazon storefront"; and

- Northeast Pharma demonstrated a willingness to cooperate in good
  faith with Medline.

7

(Doc. 34 at 10, ¶ 35.)

Plaintiffs further assert that Medline was aware that Northeast Pharma was the real party in interest for the Atlantic Pharma storefront, that Northeast Pharma was located in Vermont, and that "suspension of the Atlantic Pharma storefront was negatively impacting a Vermont business." *Id.* at ¶ 36.

On April 1, 2021, Medline filed another counterfeit report with Amazon (the "April Complaint"). The April Complaint triggered a "heightened level of scrutiny and Amazon completely shut down Northeast Pharma's seller storefront on Amazon.com[,]" *id.* at 10-11, ¶ 37, suspending all of Northeast Pharma's listings on Amazon's website and freezing its Amazon seller account funds, thus preventing Northeast Pharma from paying vendors, other business obligations, and payroll. *Id.* at 11, ¶ 37. The suspension "brought [Atlantic Pharma's storefront] operations to a halt" from April 23, 2021 until May 5, 2021. *Id.* at ¶ 38.

Northeast Pharma alleges that it contacted Medline to resolve the situation. On April 23, 2021, Mr. Becker emailed Mr. Murphy and others at Medline and advised: "I have thirty employees I am sending home for the day since the company is shut down." (Doc. 40-3 at 4.) On April 26, 2021, Mr. Becker emailed Mr. Murphy and stated, among other things:

> [a]s of this morning, the account is still deactivated and I had to tell our [thirty] staff members that they could not come to work today (for the third day since we have weekend shifts). This issue is rapidly becoming a significant financial[ ]hardship for many of our staff members and needs to be resolved.

*Id.* at 2.

According to Plaintiffs, "Medline's second repeated counterfeit claim to Amazon is identical to its initial claim that was quickly disproven as Northeast Pharma was not selling counterfeit items." (Doc. 34 at 11, ¶ 39.) Northeast Pharma underwent "a labor-intensive process with Amazon as part of the second review process[.]" *Id.* at ¶ 40. Six weeks later, Northeast Pharma succeeded "in proving that it was not selling counterfeit items and violated none of Amazon['s] policy restrictions." *Id.*

8

On June 1, 2021, Amazon conducted a further investigation of the authenticity of Northeast Pharma's inventory of Medline's perineal bottles. Amazon concluded that the bottles were authentic and again authorized Northeast Pharma to offer the products on its website. Plaintiffs allege that Amazon reached this conclusion based on Northeast Pharma's submission of invoices from HPFY, bills of ladings from Medline to Northeast Pharma, and because HPFY is an authorized reseller of Medline products.

As a result of Medline's acts and omissions, Plaintiffs allege that Amazon suspended Plaintiffs' storefront from April 23, 2021 until May 5, 2021 and that "Northeast Pharma suffered damages, including[,] but not limited to, lost profit, lost subscribers and customer goodwill, inability to sell lawful products, and damage to reputation." *Id.* at 11-12, ¶ 40. Plaintiffs claim damages only for Medline's second complaint to Amazon. *See id.* at 13, ¶ 46.

The AC alleges two claims against Medline: tortious interference with contractual relations (Count I) and defamation (Count II).

## B.  Allegations in the Third-Party Complaint.

Medline and HPFY entered into the Reseller Agreement, which authorizes HPFY as a reseller of "the [p]roducts to [e]nd-[u]sers[,]" (Doc. 60-1 at 2), and states that HPFY "shall not sell or transfer any of the [p]roducts to any person or entity for resale[,]" *id.* at 3. An "[e]nd-[u]ser" is "any purchaser of the [p]roduct(s) from the [r]eseller who is the ultimate consumer for whom the [p]roduct is designed and who does not intend to resell the [p]roduct to a third party." *Id.* at 2. The Reseller Agreement imposes reseller requirements relating to promotion and advertisement of Medline products, customer service, pricing, shipping, and use of Medline's intellectual property. With regard to indemnification, the Reseller Agreement provides:

> [HPFY] shall indemnify and hold harmless M[edline] . . . against any and all claims, damages, costs, and liabilities, including reasonable attorneys' fees, for any or all acts or omissions of [HPFY], . . . however caused, in connection with its performance or failure to perform under [the Reseller Agreement].

*Id.* at 5 (the "Indemnity Provision"). The Reseller Agreement does not contain a choice-

of-law provision. Medline made a demand for indemnity from HPFY relating to Plaintiffs' tortious interference with contractual relations and defamation claims, which HPFY refused.

Medline asserts Plaintiffs are attempting to hold it liable for the acts and omissions of HPFY because HPFY breached the Reseller Agreement by reselling Medline products to Plaintiffs and but for that breach Medline would not be subject to Plaintiffs' tort claims. The Third-Party Complaint asserts claims for breach of the Reseller Agreement (Count I) and breach of the Indemnity Provision (Count II).

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a complaint is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.*

The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff will prevail on his or her claims. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017). "When considering a motion to dismiss pursuant to Rule 12(b)(6), the district court . . . is required to accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015).

10

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016); *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."). A court is "not obliged to accept the allegations of the complaint as to how to construe such documents, but at this procedural stage, [it] should resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orchard Hill Master Fund Ltd.*, 830 F.3d at 156 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015)).

### B.    Choice of Law.

"A federal court sitting in diversity applies the choice-of-law rules of the forum state." *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003). Under Vermont law, "[t]he threshold question in choice-of-law analysis is whether a conflict exists." *Rodrigue v. Illuzzi*, 2022 VT 9, ¶ 13, 216 Vt. 308, 317, 278 A.3d 980, 986. Vermont courts "avoid choice-of-law questions where application of [the] laws of both jurisdictions would produce [the] same result." *Id.* (citing *Havill v. Woodstock Soapstone Co.*, 783 A.2d 423, 427 (Vt. 2001) (mem.)).

A right of indemnity exists if there is an express contractual agreement for indemnification under the law of the forum state, Vermont, the law of Medline's principal place of business, Illinois, or the law of HPFY's principal place of business, Connecticut.[1] In all three states, the language of a contract is afforded its plain meaning

---

[1] *See Hiltz v. John Deere Indus. Equip. Co.*, 497 A.2d 748, 751 (Vt. 1985) ("Under Vermont law, a right of indemnity exists if . . . there is an express agreement or undertaking by one to indemnify the other[.]") (internal quotation marks and citation omitted); *Travelers Cas. & Sur. Co. v. Bowman*, 893 N.E.2d 583, 590 (Ill. 2008) ("In general, the right to indemnity may be based upon an express contract or implied in law."); *Ferryman v. City of Groton*, 561 A.2d 432,

and that plain language controls the contract's interpretation if it is unambiguous.[2] There
is thus no conflict regarding the effect and interpretation of indemnification provisions,
and the court applies Vermont law in interpreting the Indemnity Provision. *See In re
Ambassador Ins. Co.*, 2022 VT 11, ¶ 34, 216 Vt. 255, 270, 275 A.3d 122, 132 (affirming
trial court's application of Vermont law where "there [was] no actual conflict" between
Vermont and Georgia law).

## C.      Whether Medline Has Plausibly Pleaded a Breach of the Indemnity Provision.

HPFY argues the Indemnity Provision is inapplicable because Plaintiffs' claims
against Medline stem from Medline's decision to report Plaintiffs for violating Amazon's
policies rather than any "acts or omissions of HPFY." (Doc. 72 at 5) (internal quotation
marks omitted). Medline counters that HPFY "is or may be liable[,]" Fed. R. Civ. P.
14(a)(1), to it for Plaintiffs' claims based on the Indemnity Provision because of the
inclusion of a broad "however caused" clause triggering indemnification.

Under Fed. R. Civ. P. 14(a)(1), "[a] defending party may, as third-party plaintiff,
serve a summons and complaint on a nonparty who is or may be liable to it for all or part
of the claim against it." Its purpose is "to promote judicial economy by eliminating the
need for a defendant to bring a separate action against a third-party who may be
secondarily or derivatively liable to the defendant for all or part of the plaintiff's claim."
*Doucette v. Vibe Recs., Inc.*, 233 F.R.D. 117, 119-20 (E.D.N.Y. 2005) (internal quotation
marks and citation omitted). "A third[-]party claim may be asserted when the third
party's liability is somehow *dependent* on the outcome of the main action or when the

---

435 (Conn. 1989) ("The right to indemnity is clear when the obligation springs from a separate
contractual relation[.]") (internal quotation marks and citation omitted).

[2] *See Southwick v. City of Rutland*, 2011 VT 105, ¶ 5, 190 Vt. 324, 327, 30 A.3d 1298, 1300
("When the plain language of the writing is unambiguous, we take the words to represent the
parties' intent, and the plain meaning of the language governs our interpretation of the contract.")
(citation omitted); *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("If the words in the
contract are clear and unambiguous, they must be given their plain, ordinary and popular
meaning."); *Montoya v. Montoya*, 909 A.2d 947, 953 (Conn. 2006) ("Where the language of the
contract is clear and unambiguous, the contract is to be given effect according to its terms.")
(internal quotation marks and citation omitted).

third party is secondarily liable to the defendant." *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 656 (S.D.N.Y. 2017) (emphasis in original). "Generally, the traditional grounds for a third-party action are indemnification, contribution, or subrogation." *Doucette*, 233 F.R.D. at 120. "A third-party claim is not permissible simply because it arises out of the same nucleus of facts as the main claim." *Zohar CDO 2003-1, Ltd.*, 286 F. Supp. 3d at 656 (internal quotation marks and citation omitted).

"[I]mpleader is permitted only when a right to relief is cognizable under the applicable substantive law." *McMillan v. Equifax Credit Info. Servs., Inc.*, 153 F. Supp. 2d 129, 131 (D. Conn. 2001) (internal quotation marks and citation omitted). In this case, Medline argues that had HPFY not breached its Reseller Agreement, Medline would not have allegedly defamed Plaintiffs or allegedly interfered with Plaintiffs' Amazon contract.

The Indemnity Provision requires HPFY to indemnify Medline against claims "for any or all acts or omissions of [HPFY.]" (Doc. 60-1 at 5.) Medline points to the words "however caused" to argue that the Indemnity Provision is broad in scope and encompasses any claims that would not have been brought "but for" HPFY's conduct, however, the "but for" test is not contained therein and, under Vermont law, the court has no power to alter the parties' contract. *See Milton Bd. of Sch. Dirs. v. Milton Staff Ass'n, Loc. 130 VEA/NEA*, 656 A.2d 993, 995 (Vt. 1995) (stating Vermont courts "will not supply terms or embrace a construction that would alter the rights of the parties as expressed in the original agreement[]"); *see also Waters v. Concord Grp. Ins. Cos.*, 725 A.2d 923, 926 (Vt. 1999) (mem.) ("The court is further bound to enforce the contract as written and not to rewrite it on behalf of one or both of the parties."). Moreover, indemnification generally requires more than a "but for" test. *See McMillan*, 153 F. Supp. 2d at 132 ("Even assuming indemnification were an available remedy, the 'but for' relationship between [the] plaintiff's claims [and the] third-party claims against [a separate party] is too attenuated to support impleader under Rule 14.") (citing *Kenneth Leventhal & Co. v. Joyner Wholesale Co.*, 736 F.2d 29, 31 (2d Cir. 1984) (holding "it is

hardly an abuse of discretion to dismiss a third-party complaint based upon . . . a speculative[] 'but for' causal link[]")).

In order to hold Medline liable for tortious interference with contractual relations, Plaintiffs will need to establish that Medline was aware of Plaintiffs' contract with Amazon, that it intentionally interfered with that contract by making complaints, that this interference was improper, and that this interference caused Plaintiffs pecuniary damage. *See Williams v. Chittenden Tr. Co.*, 484 A.2d 911, 913 (Vt. 1984) ("One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.") (quoting Restatement (Second) of Torts § 766). There is no requirement that Plaintiffs prove any acts or omissions, tortious or otherwise, by HPFY.

To succeed on their defamation claim, Plaintiffs must prove that Medline made:

(1) a false and defamatory statement concerning [Plaintiffs]; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Russin v. Wesson*, 2008 VT 22, ¶ 5, 183 Vt. 301, 303, 949 A.2d 1019, 1020 (quoting *Lent v. Huntoon*, 470 A.2d 1162, 1168 (Vt. 1983)). Again, no act or omission by HPFY is required.

Although HPFY allegedly resold Medline's products to Plaintiffs, Plaintiffs seek damages for Medline's actions, not HPFY's actions. While Medline may have a direct claim against HPFY for violation of the Reseller Agreement, it has not plausibly alleged that Plaintiffs' tortious interference with contractual relations and defamation claims were "caused" by HPFY. Because Medline fails to plausibly plead a breach of the Indemnity Provision by HPFY, its Third-Party Complaint against HPFY is improper under Fed. R. Civ. P. 14(a)(1), and must be DISMISSED.

## CONCLUSION

For the foregoing reasons, the court GRANTS HPFY's motion to dismiss. (Doc. 72.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 2ⁿᵈ day of January, 2024.

Christina Reiss, District Judge
United States District Court